**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOSEPH LAWRENCE BONACCORSO, Derivatively on Behalf of VERRICA PHARMACEUTICALS INC.,<br><br>Plaintiff,<br><br>v.<br><br>TED WHITE, PAUL B. MANNING, CRAIG BALLARON, LAWRENCE EICHENFIELD, DIEM NGUYEN, MARK PRYGOCKI, and SEAN STALFORT,<br><br>Defendants,<br><br>and<br><br>VERRICA PHARMACEUTICALS INC.,<br><br>Nominal Defendant. | Case No: 2:25-cv-03266-MSG<br><br>**CORRECTED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Joseph Lawrence Bonaccorso ("Plaintiff") is filing this Corrected Verified Shareholder Derivative Complaint ("Corrected Complaint") to include his middle name in the caption and throughout the Corrected Complaint. Plaintiff Joseph Lawrence Bonaccorso is not Joseph (Joe) Bonaccorso, the former Chief Commercial Officer of Nominal Defendant Verrica Pharmaceuticals Inc. ("Verrica" or the "Company").

Plaintiff, by and through his undersigned counsel, derivatively on behalf of and for the benefit of Nominal Defendant Verrica, submits this Corrected Complaint against Ted White ("White"), Paul B. Manning ("Manning"), Craig Ballaron ("Ballaron"), Lawrence Eichenfield ("Eichenfield"), Diem Nguyen ("Nguyen"), Mark Prygocki ("Prygocki"), and Sean Stalfort ("Stalfort") (the "Individual Defendants" and together with Verrica, "Defendants") for and among

other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of filings by Verrica with the United States Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts and shareholder communications, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought against certain current and former Verrica officers and members of Verrica's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants from May 19, 2021 through May 24, 2022 (the "Relevant Period").

2. Verrica is a clinical-stage dermatology therapeutics company that develops and sells products to treat, *inter alia*, molluscum contagiosum, a viral skin disease. The Company was founded in 2013 and since that time, its leading drug product candidate has been VP-102 (later known as YCANTH), a topical solution purported to treat molluscum and common warts.

3. To help produce its key drug product candidates like VP-102, Verrica utilizes Contract Manufacturing Organizations ("CMOs"). To this end, Verrica entered into business with Sterling Pharmaceuticals, LLC ("Sterling"), which was tasked with manufacturing VP-102's bulk solution drug product.

4. Beginning in September 2019, Verrica sought regulatory approval of VP-102 by the U.S. Food and Drug Administration ("FDA") for the treatment of molluscum. Unbeknownst

to the investing public, the manufacturing of VP-102 and the FDA approval process for the drug did not go smoothly.

5. Despite assurances from the Individual Defendants that the approval was going "according to plan," in reality, the FDA had discovered a litany of issues with the Sterling facility that was designated for manufacturing of VP-102, which would ultimately delay the FDA's approval of VP-102.

6. On May 24, 2022, the truth emerged when Verrica announced that it received a third Complete Response Letter ("CRL") from the FDA, which detailed further deficiencies identified during an inspection of Sterling.

7. As set forth herein, throughout the Relevant Period, the Individual Defendants caused the Company to issue false and misleading statements. Specifically, the Individual Defendants caused the Company to fail to disclose that: (i) the FDA investigated Sterling's manufacturing facility and issued Form 483s in May 2021 and February 2022 identifying significant manufacturing deficiencies; (ii) the manufacturing deficiencies identified by the FDA as a result of the May 2021 and February 2022 investigations were not resolved; and (iii) the foregoing FDA investigations and identified deficiencies posed significant risks to FDA approval of Verrica's December 2020 and November 2021 NDAs for VP-102. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8. On this news, Verrica's stock declined almost 64%, from a closing price of $5.56 per share on May 24, 2022, to a closing price of $2.01 per share on May 25, 2022.

9. In light of the Individual Defendants' misconduct, the Company and Defendant White were named as defendants in a federal securities fraud class action lawsuit pending in this

Court, captioned *Gorlamari v. Verrica Pharmaceuticals, Inc., et al.*, Case No. 2:22-cv-02226-MSG (the "Securities Class Action"). On January 26, 2024, Plaintiff in the Securities Class Action filed a second amended complaint (the "SAC"), reiterating certain allegations made in the initial complaint and including statements from former Verrica employees in support of those allegations. The Securities Class Action has further subjected Verrica to the need to undertake internal investigations and the need to implement adequate controls, as well as exposed the Company to massive class-wide liability.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 14(a) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78n(a)(1) and 78u-4(f)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

11. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

13. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) Verrica

maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

15. Plaintiff is a current shareholder of Verrica and has continuously held Verrica common stock at all relevant times, including prior to the beginning of the Relevant Period.

16. Nominal Defendant Verrica is a Delaware corporation with its principal executive offices located at 10 North High Street, Suite 200, West Chester, Pennsylvania 19380. The Company's common stock trades on the Nasdaq under the ticker symbol "VRCA."

17. Defendant White served as the Company's President and Chief Executive Officer ("CEO") from 2017 until 2024. According to the proxy statement (the "2025 Proxy Statement") filed with the SEC on April 30, 2025, in 2024, Defendant White received $2,594,832 in total compensation from the Company.

18. Defendant Manning has served as a Company director since 2015 and as Chairman of the Board since 2017. According to the 2025 Proxy Statement, as of April 1, 2025, Defendant Manning, and entities affiliated with him, beneficially owned 53,707,727 shares of the Company's common stock, amounting to 49.99% of all outstanding Verrica common stock.

19. Defendant Ballaron served as a Company director from 2019 until 2024. According to the 2025 Proxy Statement, in 2024, Defendant Ballaron received $180,650 in total compensation from the Company.

20. Defendant Eichenfield has served as a Company director since 2020. Defendant

Eichenfield also serves as the Chair of the Board's Nominating and Corporate Governance Committee, and as a member of both the Audit Committee and the Compensation Committee. According to the 2025 Proxy Statement, in 2024, Defendant Eichenfield received $191,900 in total compensation from the Company.

21. Defendant Nguyen has served as a Company director since 2020. Defendant Nguyen also serves as the Chair of the Board's Compensation Committee, and as a member of the Audit Committee. According to the 2025 Proxy Statement, in 2024, Defendant Nguyen received $171,900 in total compensation from the Company.

22. Defendant Prygocki has served as a Company director since 2018. Defendant Prygocki also serves as the Chair of the Board's Audit Committee, and as a member of both the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2025 Proxy Statement, in 2024, Defendant Prygocki received $201,900 in total compensation from the Company.

23. Defendant Stalfort has served as a Company director since 2015. According to the 2025 Proxy Statement, as of April 1, 2025, Defendant Stalfort beneficially owned 2,997,394 shares of the Company's common stock, amounting to 3.2% of all outstanding Verrica common stock.

24. Non-Party Jayson Rieger has served as the Company's President and CEO since 2024. According to the 2025 Proxy Statement, in 2024, Rieger received $1,236,225 in total compensation from the Company. Rieger is named herein solely for the purposes of demand futility.

25. Non-Party Gavin Corcoran has served as a Company director since March 2025. According to the Company's public filings, Corcoran receives a $40,000 retainer, as well as significant stock options, as compensation for his role as a Company director. Corcoran is named

herein solely for the purposes of demand futility.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

26. By reason of their positions as officers, directors, and/or fiduciaries of Verrica and because of their ability to control the business and corporate affairs of Verrica, the Individual Defendants owed Verrica and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Verrica in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Verrica and its shareholders.

27. Each director and officer of Verrica owes to Verrica and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of Verrica and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

28. The Individual Defendants, as officers and/or directors of a publicly held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, had a duty to promptly disseminate accurate and truthful information regarding Verrica's operations, finances, financial condition, financial statements, performance, growth, earnings, internal controls, and present and future business prospects so that the market price of Verrica's stock would be based on truthful, accurate, and fairly presented information.

29. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Verrica, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Verrica. Because of their advisory, executive, managerial and directorial positions with Verrica, each of the Individual Defendants had access to adverse non-public

information about the financial condition, operations, sales and marketing practices, and improper representations of Verrica.

30. The Individual Defendants, as officers and/or directors of Verrica, were required to discharge their duties by exercising reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of Verrica. By virtue of such duties, the officers and directors of Verrica were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, ethical, and businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide the public, investors, and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of internal legal, financial, and management controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations;

and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

31. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Verrica and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

32. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Verrica, the absence of good faith on their part, and a reckless disregard for their duties to Verrica and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33. The Individual Defendants breached their duties of loyalty and good faith by causing Verrica to issue false and misleading statements concerning its financial condition. As a result, Verrica has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## <u>THE CODE OF BUSINESS CONDUCT AND ETHICS</u>

34. Verrica maintains a Code of Business Conduct and Ethics (the "Code of Conduct"), which states that it "reflects the business practices and principles of behavior that support" the Company's commitment to "creating an environment where we do our best work while maintaining the highest standards of business conduct and ethics." The Code of Conduct further states that the Company "expect[s] every director, officer and employee to read and understand the Code of Conduct."

35. In a section titled "Honest and Ethical Conduct," the Code of Conduct provides as follows:

> It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

36. In a section titled "Legal Compliance," the Code of Conduct provides the following in relevant part:

> Obeying the law is the foundation of the Code of Conduct. Our success depends upon our personnel operating within legal guidelines and cooperating with local, national and international authorities. We expect our personnel to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you have a question about legal compliance, you must seek an answer from your supervisor or the Compliance Officer.
>
> Disregard of the law will not be tolerated. Violation of laws, rules and regulations of any country may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

37. In a section titled "Maintenance of Corporate, Books, Records, Documents and Accounts; Financial Integrity; Public Reporting," the Code of Conduct provides the following, in relevant part:

> The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries in our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to our partners, customers, contributors, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or liabilities or misclassifies any transactions as to accounts or accounting periods;
- transactions be supported by appropriate documentation;
- the terms of commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;
- personnel comply with our system of internal controls; and
- no cash or other assets be maintained for any purpose in any unrecorded or “off-the-books” fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, and governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may knowingly take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;
- all employees must cooperate fully with our accounting and audit teams, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and
- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee or one of the other compliance resources described in Section 10 or in accordance with the provisions of the Company’s Open Door Policy for Reporting Complaints Regarding Accounting and Auditing Matters.

## THE CORPORATE GOVERNANCE GUIDELINES

38. Verrica also maintains Corporate Governance Guidelines (the "Guidelines"). In a subsection titled "Independence of Directors," the Guidelines provide as follows:

> It is the policy of the Company that the Board be composed of not less than a majority of independent directors, subject to any exceptions permitted by The Nasdaq Global Market (the "Exchange") listing standards (the "Listing Standards"). In determining independence, the Board will consider the definition of independence set forth in the Listing Standards, as well as other factors that will contribute to effective oversight and decision-making by the Board.

39. In a section titled "Role of the Board of Directors," the Guidelines provide the following:

> The Board is selected by the stockholders to provide oversight of, and strategic guidance to, senior management. The core responsibility of a Board member is to fulfill his or her fiduciary duties of care and loyalty and otherwise to exercise his or her business judgment in the best interests of the Company and its stockholders. Service on the Board requires significant time and attention on the part of directors. More specifically, the Board has responsibilities to review, approve and monitor fundamental financial and business strategies and major corporate actions, assess major risks facing the Company and consider ways to address those risks, select and oversee management and determine its composition and oversee the establishment and maintenance of processes and conditions to maintain the integrity of the Company. Directors must participate in Board meetings, review relevant materials, serve on committees and prepare for meetings and discussions with management. Directors are expected to maintain an attitude of constructive involvement and oversight; they are expected to ask relevant, incisive and probing questions and require honest and accurate answers. Directors must act with integrity and are expected to demonstrate a commitment to the Company, its values and its business and to stockholder value. Directors are encouraged to attend the Company's annual general meeting of stockholders, either in person or telephonically.

## THE AUDIT COMMITTEE CHARTER

40. Verrica also maintains a Charter of the Audit Committee of the Board of Directors (the "Charter"), which states that the purpose of the Audit Committee is to:

> act on behalf of the Board of Directors . . . in fulfilling the Board's oversight responsibilities with respect to (i) the Company's corporate accounting and

financial reporting processes, (ii) the Company's systems of internal control over financial reporting and audits of financial statements, (iii) the quality and integrity of the Company's financial statements and reports, (iv) the qualifications, independence and performance of the registered public accounting firm or firms of certified public accountants engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors") and (v) the performance of the Company's internal audit function, if and when the Company has such a function.

41. In a section titled "Responsibilities," the Charter provides the following:

The Committee shall oversee the Company's financial reporting process on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for the Company. The Auditors and each such other registered public accounting firm shall report directly and be accountable to the Committee. The Committee's functions and procedures should remain flexible to address changing circumstances most effectively. To implement the Committee's purpose and policy, the Committee shall be charged with the following functions and processes with the understanding, however, that the Committee may supplement or (except as otherwise required by applicable laws or rules) deviate from these activities as appropriate under the circumstances:

*Responsibilities with respect to Auditors*

**1.** ***Evaluation and Retention of Auditors***. To evaluate the performance of the Auditors, to assess their qualifications (including their internal quality control procedures and any material issues raised by that firm's most recent internal quality control review or any investigations by regulatory authorities) and to determine whether to retain, or to terminate, the engagement of the existing Auditors, or to appoint and engage a different independent registered public accounting firm.

***

**6**. ***Auditor Independence***. At least annually, consistent with Rule 3526, to receive and review written disclosures from the Auditors delineating all relationships between the Auditors, or their affiliates, and the Company, or persons in financial oversight roles at the Company, that may reasonably be thought to bear on independence, and a letter from the Auditors affirming their independence, to consider and discuss with the Auditors any potential effects of any such relationships on the independence of the Auditors as well as any compensation or services that could affect the Auditors' objectivity and independence, and to assess and otherwise take appropriate action to oversee the independence of the Auditors.

*Responsibilities with respect to Financial Statements and Related Disclosures*

**11**. ***Audited Financial Statement Review.*** To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and to recommend to the Board whether or not such financial statements should be so included.

**12**. ***Annual Audit Results.*** To review with management and the Auditors the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of the Company's accounting principles and practices, the Auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates), all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial), the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB.

**13**. ***Quarterly Results.*** To review and discuss with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under standards of the PCAOB.

**14**. ***Management's Discussion and Analysis.*** To review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

**15**. ***Disclosure Committee.*** To meet with the Disclosure Committee (or a representative thereof), as part of the Committee's regular review of the Company's Form 10-K and Form 10-Q reports (and other filings by the Company with the SEC, when applicable and as deemed necessary, appropriate or desirable by management). 16. Press Releases. To review and discuss with management and the Auditors, as appropriate, earnings press releases, and press releases containing information relating to material developments as well as the substance of financial information, information relating to material developments and earnings guidance provided to analysts and rating agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chairman of the Committee may represent the entire Committee for purposes of these discussions. 17. Accounting Principles and Policies. To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles ("GAAP") related to material items discussed with management, the potential impact on the Company's financial

statements of off-balance sheet structures and, if in the judgment of the Committee such review is necessary or appropriate, any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements, compliance programs and policies.

***

**19.** ***Risk Assessment and Management.*** To review and discuss with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to risk assessment and risk management, including risks relating to the Company's accounting matters, financial reporting and legal and regulatory compliance and the steps taken by management to monitor and control these exposures; and to review and discuss with management, as appropriate, insurance programs, including director and officer insurance, product liability insurance and general liability insurance.

*Responsibilities with respect to Internal Audit and Internal Control*

**22**. ***Internal Control Over Financial Reporting.*** To confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of the Company's internal control over financial reporting including (a) significant deficiencies or material weaknesses identified by the Company's Auditors, as well as any special steps adopted in light of significant deficiencies or material weaknesses, if any, and the adequacy of disclosures about changes in internal control over financial reporting, and (b) any fraud, whether or not material, that involves management or other employees who have any significant role in the Company's internal control over financial reporting.

**23**. ***Internal Audit Function.*** To evaluate from time to time the necessity for the Company to adopt a formal internal audit function. At such time as the Company adopts an internal audit function, the Committee shall coordinate the Board's oversight of the performance of that function. In this regard, the Committee shall review the appointment of the senior internal auditing manager and shall review any reports to management or the Board from the internal audit department and management's response to such reports.

***

*Other Responsibilities*

***

**30**. ***Ethical Compliance.*** To review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to its Code of Ethical Conduct.

## SUBSTANTIVE ALLEGATIONS

***Background***

42. On July 21, 2023, the FDA approved VP-102 for the treatment of mulluscum in patients over two years old. Verrica then began referring to VP-102 by its brand name YCANTH and commercially launched YCANTH in August 2023. VP-102 became the Company's lead product candidate and the center of the Company's business strategy.

43. As admitted in the 2021 10-K (defined below) the Company "devoted substantially all of our financial resources and efforts to the development of our novel topical solution of cantharidin and our lead product candidate, VP-102, for the treatment of molluscum, including preclinical studies and clinical trial."

44. By January 2019, VP-102 had yielded positive top-line results in its Phase 3 pivotal trials and the Company planned to apply for FDA approval in the second half of 2019.

45. In September 2019, Verrica submitted its initial New Drug Application ("NDA") for VP-102, but received a CRL from the FDA in July 2020 rejecting the application. The FDA's July 2020 CRL identified the need for additional information regarding certain aspects of the Chemistry, Manufacturing and Controls process for the drug/device combination as well as Human Factors validation, but it did not note any clinical deficiencies. Thereafter, Verrica held a Type A meeting with the FDA to discuss the issues identified in the CRL and the resubmission of the NDA for VP-102. The Company stated that it intended to resubmit its NDA for VP-102 in the first quarter of 2021.

46. To help produce its key drug product candidates like VP-102, Verrica utilizes CMOs. To this end, Verrica entered into business with Sterling, which was tasked with manufacturing VP-102's bulk solution drug product.

***The December 2020 NDA and Sterling's May 2021 FDA Inspection***

47. On December 23, 2020, the Company announced that it had resubmitted its NDA for VP-102 to the FDA for the treatment of molluscum. The FDA later "accepted" the NDA for review in February 2021 and set a Prescription Drug User Fee Act ("PDUFA") target action date of June 23, 2021.

48. Between May 3 and May 14, 2021, in connection with the December 2020 resubmitted VP-102 NDA, the FDA conducted an investigation of Sterling's facilities (the "May 2021 Inspection").

49. Then, on May 28, 2021, Verrica announced that the FDA had extended the review period on the NDA, setting a new PDUFA date of September 23, 2021. Following the May 2021 Inspection, the FDA issued a Form 483 memorializing the following serious departures from Current Good Manufacturing Practices ("cGMP")[1] identified at the Sterling facility:

(1) Procedures designed to prevent microbiological contamination of drug products purporting to be sterile are not established, written and/or followed.

(2) Aseptic processing areas are deficient regarding the system for monitoring environmental conditions.

(3) Written records of investigations into unexplained discrepancies and failures of a batch or any of its components to meet specifications do not always include the conclusions and follow-up.

(4) The responsibilities and procedures applicable to the quality control unit are not in writing and fully followed.

50. According to the SAC, the Company was aware of the results of the May 2021

[1] Generally, cGMP regulations for drugs contain minimum requirements for manufacturers and facilities concerning all aspects of production, including buildings and facilities, organization and personnel, equipment, control of components and drug product containers and closures, production and process controls, packaging and labeling control, holding and distribution, laboratory controls, records and reports and returned and salvaged drug products.

Inspection because: (i) various Company personnel were on-site during the FDA inspection, (ii) certain Verrica employees discussed the Form 483 in mid-May 2021, and (iii) those Verrica employees present in the mid-May 2021 meeting acknowledged that the Form 483 would delay the launch of VP-102.

51. The FDA classified the May 2021 inspection as "Voluntary Action Indicated" (or "VAI"), meaning the agency was not prepared to take or recommend any administrative or regulatory action. The FDA's EIR relating to the May 2021 Sterling inspection, issued on June 21, 2021, noted that "[m]ajor quality system elements such as CAPAs [corrective and preventive actions], root cause analysis, OOS investigations were issues during the previous inspection and have continued to present during this inspection." The EIR also noted that, in addition to the FDA Form 483, objectionable conditions were verbally discussed during the May 2021 Inspection, including: (i) lack of data integrity controls for the production environments, (ii) lack of/incomplete trending practices, and (iii) various aseptic practices increased risk to the product.

52. On September 20, 2021, Verrica issued a press release (the "September 2021 Press Release") disclosing Sterling's known cGMP deficiencies and that stating that VP-102's approval would be delayed. The September 2021 Press Release further announced that the Copmany had received a CRL rejecting its December 2020 NDA for VP-102 (now its second CRL for VP-102) following the May 2021 Inspection.

53. The September 2021 Press Release downplayed the importance of the FDA's conclusions, noting that the deficiencies were "not specifically related to the manufacturing of VP-102 but instead raise general quality issues at the facility [*i.e.*, Sterling]" and that "importantly, the FDA did not identify any clinical, safety or product specific Chemistry, Manufacturing, and Controls (CMC) deficiencies related to VP-102." The Company also assured the market that

Sterling "has implemented corrective actions to address the [FDA's] concerns and [Sterling] has advised Verrica that it is expecting a satisfactory resolution of the facility's identified deficiencies from the FDA within the next 30 business days."

54. Then, on November 12, 2021, Verrica issued a press release announcing that, on November 5, 2021, the Company had been informed that the FDA's Sterling inspection was closed and that the Voluntary Action Indicated status would not "directly negatively impact FDA's assessment of the Company's NDA regarding this CMO." The Individual Defendants were therefore on notice that any reinspection of Sterling was of critical importance to the approval of Verrica's resubmitted NDA for VP-102.

***The November 2021 NDA***

55. On November 29, 2021, Verrica announced it had resubmitted an NDA for VP-102. It opted to keep Sterling as its CMO for VP-102. The Company explained that "[t]he resubmission is limited to those sections and elements of the NDA that were identified as deficiencies in the Complete Response Letter (CRL) issued by the FDA in September 2021. The resubmission addresses the successful resolution of inspection deficiencies identified at a contract manufacturing organization (CMO) in the CRL[.]"

56. On December 15, 2021, Verrica announced that the FDA "accepted" its latest NDA resubmission and assigned a May 24, 2022 PDUFA date.

57. In connection with the resubmitted November 2021 NDA, the FDA reinspected Sterling's facilities between February 7 and 18, 2022 (the "February 2022 Inspection"), again resulting in a four-item Form 483 documenting the following cGMP deficiencies:

(1) Procedures designed to prevent microbiological contamination of drug products purporting to be sterile did not include adequate validation of the aseptic process.

(2) The responsibilities and procedures applicable to the quality control unit are not in writing and fully followed.

(3) There is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed.

(4) Procedures designed to prevent microbiological contamination of drug products purporting to be sterile are not followed.

58. The FDA's February 2022 Form 483 included repeat observations—documenting that, despite Verrica's assertions otherwise, the FDA was not satisfied that Sterling's deficiencies had been successfully resolved. The problems were so severe that the FDA classified the February 2022 inspection as Official Action Indicated, its highest tier of violations. Official Action Indicated determinations are rare and reserved for situations where administrative or enforcement action is recommended and "one or more manufacturing systems is out of control."

59. Just as with the May 2021 Inspection and resulting Form 483, the Company immediately knew that the February 2022 Inspection had taken place and had concluded with the issuance of a Form 483, according to confidential witness allegations in the SAC, who claim that: (i) recognizing the critical risk of Sterling's February 2022 inspection, Verrica sent five employees to Sterling's facilities during the inspection to monitor developments, (ii) Sterling provided daily updates to Verrica's employees and management, including Defendant White, and (iii) Verrica learned of the Form 483 upon the conclusion of the February 2022 Sterling inspection.

60. On September 27, 2022, the FDA issued a warning letter to Sterling explaining that "your firm has significant violations of CGMP regulations. Your firm's poor manufacturing practices are particularly concerning because many of your products[] ... are ophthalmic and directed for use in young children." The letter to Sterling also noted that "[s]ignificant findings in this letter demonstrate that your firm does not operate an effective quality system in accord with

CGMP. In addition to the lack of effective production operations oversight to ensure reliable facilities and equipment, we found your quality unit is not enabled to exercise proper authority and/or has insufficiently implemented its responsibilities."

61. Then, on May 24, 2022, the FDA again rejected Verrica's VP-102 NDA by issuing a CRL, again citing Sterling's many cGMP failures.

***Materially False and Misleading Statements Issued During the Relevant Period***

62. The Relevant Period begins on May 19, 2021, when Defendant White participated in the RBC Capital Markets Global Healthcare Conference and stated: "we fully anticipate that we'll have our [FDA] inspections take place according to plan, and we have not been notified otherwise."

63. On May 28, 2021, the Company issued a press release announcing that: "the FDA has recently completed one of the two pre-approval inspections required for approval."

64. On June 2, 2021, Defendant White appeared on behalf of Verrica at the Jeffries 2021 Virtual Healthcare Conference. During that appearance, Defendant White claimed that the FDA's new September 23, 2021 response date for VP-102's NDA would "give the agency more time to review data and complete one inspection at one of our facilities."

65. On March 2, 2022, Verrica filed an annual report on Form 10-K with the SEC (the "2022 10-K"). Defendants White, Manning, Stalfort, Ballaron, Prygocki, Eichenfield, and Nguyen signed the 2022 10-K, which stated:

> "On November 5, 2021, we were notified that the inspection of the CMO that had been classified as 'voluntary action indicated', or VAI, is now closed and that the VAI classification would not directly negatively impact FDA's assessment of our NDA regarding this CMO. With the satisfactory resolution of the facility inspection, we resubmitted the NDA for the approval of VP-102 for the treatment of molluscum on November 29, 2021" and that "The resubmission addressed the successful resolution of inspection deficiencies identified at the CMO in the CRL, as well as the recommendations included in the General Advice Letter received

from the FDA that relate to VP-102's user interface"

66. On May 9, 2022, Verrica filed a quarterly report on Form 10-Q with the SEC (the "Q1 2022 10-Q"). Appended to the Q1 2022 10-Q were certifications, signed by Defendant White, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") nad attesting to the accuracy of the statements contained therein. The Q1 2022 10-Q reiterated the above statement contained in the 2022 10-K, claiming that Sterling's deficiencies had been satisfactorily and successfully resolved.

67. On March 9, 2022, Defendant White participated in the Cowen 42nd Annual Health Care Conference. During an appearance at that conference, Defendant White stated: "I will tell you we've had a very consistent and very production communication with the FDA and we'll continue to work with the FDA toward an approval of YCANTH on our before our May PDUFA date, May 24 PDUFA date."

68. On April 14, 2022, Defendant White attended the 21st Annual Needham Virtual Healthcare Conference. During an appearance at that conference, Defendant White stated: "And what we've done, just to ensure that everything is a go. We hired Jeff Yuen & Associates who is a former FDA inspector, as well as Greenleaf. And we had them go out and do mock inspections at all of our CMO facilities to ensure that all our CMOs were inspection ready." At the same Needham conference, when asked about VP-102's approval prospects, Defendant White responded, "From your lips to God's ears. Yes, I am very optimistic."

69. The above statements were materially false and misleading. Specifically, the Individual Defendants failed to disclose that: (i) the FDA investigated Sterling's manufacturing facility and issued Form 483s in May 2021 and February 2022 identifying significant manufacturing deficiences; (ii) the manufacturing deficiencies identified by the FDA as a result of the May 2021 and February 2022 investigations were not resolved; and (iii) the foregoing FDA

investigations and identified deficiencies posed significant risks to FDA approval of Verrica's December 2020 and November 2021 NDAs for VP-102. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

***The 2022 Proxy Statement***

70. On April 22, 2022, Verrica filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). The 2022 Proxy Statement was solicited by Defendants White, Manning, Eichenfield, Ballaron, Prygocki, Stalfort, and Nguyen and sought shareholder approval for, *inter alia*, the election of Defendants Stalfort and Nguyen to the Board.

71. In a section titled "Role of the Board in Risk Oversight," the 2022 Proxy Statement provided as follows:

> Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, legal and compliance, cybersecurity and reputational. One of the key functions of our Board of Directors is informed oversight of our risk management process. Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of our Board of Directors that address risks inherent in their respective areas of oversight. In particular, our Board of Directors is responsible for monitoring and assessing strategic risk exposure and our Audit Committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The Audit Committee also monitors compliance with legal and regulatory requirements. Our Nominating and Corporate Governance Committee monitors the effectiveness of our corporate governance guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. It is the responsibility of the committee chairs to report findings regarding material risk exposures to the Board as quickly as possible. The Board Chairman coordinates between the Board and management with regard to the determination and implementation of responses to any problematic risk management issues.

72. In a section titled "Code of Business Conduct and Ethics," the 2022 Proxy Statement provides as follows:

> We have adopted a Code of Business Conduct and Ethics (the "Code of Conduct") applicable to all of our employees, executive officers and directors. The Code of Conduct is available on our website at www.verrica.com. The Nominating and Corporate Governance Committee is responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for executive officers and directors. If we make any substantive amendments to the Code of Conduct or grants any waiver from a provision of the Code of Conduct to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website.

73. The foregoing statements contained in the 2022 Proxy Statement were materially false and misleading because, contrary to the assertions contained therein, the Individual Defendants failed to carry out their obligations related to risk management and failed to abide by the Code of Conduct.

74. Moreover, the 2022 Proxy Statement was materially false and misleading as it failed to disclose that: (i) the FDA investigated Sterling's manufacturing facility and issued Form 483s in May 2021 and February 2022 identifying significant manufacturing deficiences; (ii) the manufacturing deficiencies identified by the FDA as a result of the May 2021 and February 2022 investigations were not resolved; and (iii) the foregoing FDA investigations and identified deficiencies posed significant risks to FDA approval of Verrica's December 2020 and November 2021 NDAs for VP-102. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

75. On May 24, 2022, Verrica issued a press release announcing that it had received a third CRL from the FDA rejecting its NDA for VP-102. The new CRL cited "deficiencies

identified at a general reinspection" of Sterling in February 2022. The "deficiencies" identified by the FDA had persisted despite repeated prior warnings and related to the FDA's "general reinspection of Sterling Pharmaceuticals Services, LLC (Sterling), the contract manufacturing organization (CMO) that manufactures Verrica's bulk solution drug product." Additionally, "Sterling advised Verrica on May 20, 2022 that it received notice that it is on OAI status," which "resulted from a week-long inspection of the CMO conducted by FDA in February 2022." While "none of the issues identified by FDA during the reinspection were specific to the manufacturing of VP-102" and "the VP-102 label was ready to be communicated," Verrica acknowledged that the FDA will not approve an NDA when a CMO like Sterling has an "unresolved classification or is placed on OAI status."

76. On this news, Verrica's stock declined almost 64%, from a closing price of $5.56 per share on May 24, 2022, to a closing price of $2.01 per share on May 25, 2022.

**DAMAGES TO VERRICA**

77. As a direct and proximate result of the Individual Defendants' misconduct, Verrica has expended and will continue to expend significant sums of money.

78. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

79. Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

80. Verrica has also suffered, and will continue to suffer, a loss of reputation and

goodwill as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward due to their misrepresentations.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

81. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82. Plaintiff brings this action derivatively in the right and for the benefit of Verrica to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, unjust enrichment, violations of Section 14(a) of the Exchange Act, and other wrongful conduct as alleged herein.

83. Plaintiff has owned Verrica common stock since before the beginning of the Relevant Period and has continuously been an owner of Company stock during all relevant times.

84. Plaintiff will adequately and fairly represent the interests of Verrica and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

85. A pre-suit demand on the Board is futile and therefore excused. At the time this action commenced, the Board consisted of seven directors: Defendants Manning, Eichenfield, Nguyen, Prygocki, and Stalfort (the "Director Defendants"), as well as Non-Parties Rieger and Corcoran. All seven members of the Board are incapable of exercising independent objective judgment and/or making an independent and disinterested decision about whether to institute and vigorously prosecute this action.

86. The Director Defendants all face a substantial likelihood of liability for their individual misconduct, as they were directors during the time of the false and misleading statements and as such had a fiduciary duty to ensure that Verrica's SEC filings, press releases,

and other public statements and presentations on behalf of Verrica concerning its business, operations, prospects, internal controls, and financial statements were accurate.

87. The Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that Verrica was acting legally and its internal controls were sufficiently robust and effective, and to ensure that the Board's duties were being discharged in good faith and with the required diligence. Instead, they reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused Verrica's stock to trade at artificially inflated prices.

88. The Director Defendants knowingly and consciously allowed the authorization of false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that Verrica's internal controls were sufficiently robust and effective, and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. These knowing and conscious failures breached the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

89. The Director Defendants will not bring a suit on behalf of Verrica to recover damages sustained because of this misconduct because they would expose themselves to significant liability. As such, demand is futile as to the Director Defendants.

90. Demand against Defendant Manning is futile for the following additional reasons. Defendant Manning has served as a Company director since 2015 and as Chairman of the Board since 2017. Defendant Manning signed the 2022 10-K and solicited the 2022 Proxy Statement, both of which contained false and misleading statements. As a Company Director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading

statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Manning breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

91. Demand against Defendant Eichenfield is futile for the following additional reasons. Defendant Eichenfield has served as a Company director since 2020. Defendant Eichenfield receives significant compensation from the Company as detailed above. Defendant Eichenfield signed the 2022 10-K and solicited the 2022 Proxy Statement, both of which contained false and misleading statements. As a Company Director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Eichenfield breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

92. Demand against Defendant Nguyen is futile for the following additional reasons. Defendant Nguyen has served as a Company director since 2020. Defendant Nguyen receives significant compensation from the Company as detailed above. Defendant Nguyen the 2022 10-K and solicited the 2022 Proxy Statement, both of which contained false and misleading statements. As a Company Director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor controls over reporting, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Nguyen breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore,

excused.

93. Demand against Defendant Prygocki is futile for the following additional reasons. Defendant Prygocki has served as a Company director since 2018. Defendant Prygocki receives significant compensation from the Company as detailed above. Defendant Prygocki signed the 2022 10-K and solicited the 2022 Proxy Statement, both of which contained false and misleading statements. As a Company Director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Prygocki breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

94. Demand against Defendant Stalfort is futile for the following additional reasons. Defendant Stalfort has served as a Company director since 2015. Defendant Stalfort receives significant compensation from the Company as detailed above. Defendant Stalfort signed the 2022 10-K and solicited the 2022 Proxy Statement, both of which contained false and misleading statements. As a Company Director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Stalfort breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

95. Demand against Rieger is futile for the following additional reasons. Rieger is neither disinterested nor independent, and therefore, is incapable of considering demand because

he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with Verrica, rendering him not independent. As such, Rieger cannot independently consider any demand to sue himself for breaching his fiduciary duties to Verrica, because that would expose him to liability and threaten his livelihood. As such, Rieger could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Rieger is therefore futile.

96. Corcoran has served as a member of the Board since March 2025. The Company provides Corcoran with significant compensation as detailed above. As such, Corcoran cannot independently or impartially consider any demand adverse to the Director Defendants serving on the Compensation Committee who determine Corcoran's compensation. Corcoran therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Corcoran is thus futile.

**Additional Reasons Demand is Futile**

97. Defendants Eichenfield, Nguyen, and Prygocki served as members of the Audit Committee during the Relevant Period. The Audit Committee is required to oversee, among other things, the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein. In violation of the Charter, Defendants Eichenfield, Nguyen, and Prygocki failed to adequately exercise their risk management and risk assessment functions and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Eichenfield, Nguyen, and Prygocki further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

98. Verrica has been and will continue to be exposed to significant losses due to the

wrongdoing complained of herein, yet the Director Defendants have not caused Verrica to take action to recover the damages Verrica has suffered and will continue to suffer thereby.

99. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause Verrica to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

100. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

101. The Director Defendants' conduct described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of Verrica. Accordingly, demand is excused as being futile.

102. Publicly traded companies, such as Verrica, typically carry director and officer liability insurance from which Verrica could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Verrica's damages. If no such insurance is carried, then the Director Defendants will not cause Verrica to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

103. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIM I

### Against The Individual Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

104. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

106. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

107. Under the direction and watch of the Individual Defendants, the 2022 Proxy Statement failed to disclose that the Individual Defendants had violated the Code of Conduct and that the Board's risk oversight mechanisms were evidently inadequate given the aforementioned misconduct.

108. The 2022 Proxy Statement also failed to disclose that: (i) the FDA investigated Sterling's manufacturing facility and issued Form 483s in May 2021 and February 2022 identifying significant manufacturing deficiences; (ii) the manufacturing deficiencies identified by the FDA as a result of the May 2021 and February 2022 investigations were not resolved; and (iii) the foregoing FDA investigations and identified deficiencies posed significant risks to FDA approval of Verrica's December 2020 and November 2021 NDAs for VP-102. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

109. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including, but not limited to, the reelection of Defendants Stalfort and Nguyen to the Board, thus allowing them to continue breaching their fiduciary duties to Verrica.

110. Verrica was damaged because of the Individual Defendants' material

misrepresentations and omissions in the 2022 Proxy Statement.

111. Plaintiff, on behalf of Verrica, has no adequate remedy at law.

## CLAIM II

### Against Defendant White for Contribution Under Section 21D of the Exchange Act

112. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113. The conduct of Defendant White as described herein has exposed the Company to significant liability under various federal securities laws by their misconduct.

114. Verrica and Defendant White are named as defendants in the related Securities Class Action that alleges and asserts claims arising under the federal securities laws. Verrica is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

115. If Verrica is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendant White as alleged herein, who have caused the Company to suffer substantial harm through his misconduct. Verrica is entitled to contribution and indemnification from Defendant White in connection with all claims that have been, are, or may be asserted against the Company by virtue of his wrongdoing.

116. As both an officer and a director, Defendant White had the power or ability to, and did, control or influence, either directly or indirectly, Verrica's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

117. Defendant White is liable under Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

118. Defendant White has damaged the Company and is liable to the Company for contribution.

119. As such, Verrica is entitled to receive all appropriate contribution or indemnification from Defendant White.

**CLAIM III**

**Against the Individual Defendants for Breach of Fiduciary Duties**

120. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

121. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

122. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

123. The Individual Defendants knowingly issued false financial statements and made false and misleading statements regarding Verrica's business operations, practices, and international controls in connection therewith, as alleged herein. These actions could not have been a loyal and good faith exercise of prudent business judgment to protect and promote Verrica's corporate interests.

124. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Verrica has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs

associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

125. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

126. Plaintiff, on behalf of Verrica, has no adequate remedy at law.

**CLAIM IV**

**Against the Individual Defendants for Gross Mismanagement**

127. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

128. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

129. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Verrica has sustained significant damages in excess of hundreds of millions of dollars and will continue to sustain significant damages.

130. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

131. Plaintiff, on behalf of Verrica, has no remedy at law.

**CLAIM V**

**Against the Individual Defendants for Waste of Corporate Assets**

132. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

134. As a result of the misconduct described above, and by failing to properly consider the interests of Verrica and its public shareholders, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to investigate and defend Defendants' unlawful actions; and (iv) causing the loss of financing from investors and business from future customers who no longer trust Verrica and its products.

135. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

136. Plaintiff, on behalf of Verrica, has no adequate remedy at law.

## **CLAIM VI**

### **Against the Individual Defendants for Unjust Enrichment**

137. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

138. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Verrica.

139. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other

payments that were unjust in light of the Individual Defendants' bad faith conduct.

140. Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: June 26, 2025

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Olivia D. Simkins*
Olivia D. Simkins (PA ID: 336339)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Email: osimkins@rosenlegal.com
Telephone: (215) 600-2817

Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

**VERIFICATION**

I, Joseph Bonaccorso am a plaintiffin the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct. Executed this 6/19/2025.

Signed by:

Joseph Bonaccorso

95333C5C345A4D7...

Joseph Bonaccorso